## VOLUNTARY ARBITRATION PROCEEDINGS

| | |
|---|---|
| In the Matter | ( Opinion and Award |
| of the Arbitration | ( |
| | ( Grievant: Dustin Jett |
| Between | ( |
| | ( Date of Hearing: July 10, 2019 |
| Frontier Communication | ( |
| Corporation | ( |
| | ( Record Closed: October 1, 2019 |
| | ( |
| | ( |
| And | ( |
| | ( |
| Communications Workers | ( |
| Of America | ( Date of Award: December 1, 2019 |

Representing the Company:   Richard M. Wallace, Esq.
Attorney

Representing the Union:   James R. Glowacki, Esq.
Attorney

William J. Miller, Jr.
Arbitrator

## I. THE GRIEVANCE

Dustin Jett, the grievant herein, an operator for Frontier Communications Company (hereafter referred to as the "Company") was suspended and terminated from his employment. Grievances were filed on his behalf by Local Union 2011 of the Communications Workers of America (hereafter referred to as the "Union"). The grievances were filed in accordance with the applicable provisions of the General Agreement between Communications Workers of America, AFL-CIO and Frontier Communications, Frontier West Virginia Inc., August 3, 2013 to August 5, 2017 (hereafter referred to as the "Agreement"). The grievances were denied by the Company. The Union appealed the grievances to arbitration. This arbitrator was selected to hear and decide the issue. A hearing was held in Bridgeport, West Virginia on July 10, 2019. During the hearing, the parties were able to present evidence, both oral and written, to examine and cross examine the witnesses who were sworn and sequestered, and to argue their respective positions. In lieu of oral closing arguments, the parties decided to file post hearing briefs. The briefs were received in the office of the arbitrator on October 1, 2019, at which time the record was considered closed.

## II. BACKGROUND

Pamela Rutherford, Supervisor with Operator Services and Same Day Administration, stated that the grievant reports to her. She briefly described the duties the grievant, an operator, performed on a regular basis. Ms. Rutherford discussed Article 11 of the Agreement, which is the non-discrimination clause. She pointed out this clause provides that there is an agreement with the Union and Company that it is unlawful to

1

discriminate, specifically regarding race, color, religion, sex, sexual orientation, age, disability and national origin. She stated that in her opinion, as a manager of the Company, if the Company determines that an employee has committed an act of discrimination, that the Company would be in violation of the Agreement if it didn't take action against the employee. She submitted the Company's code of business conduct and ethics, which she said is applicable to all Company employees, including the grievant. She contended such code provides that the Company has a zero tolerance for discrimination and threats of any kind, and the code provides the Company "does not tolerate illegal discrimination, harassment or threats of any kind". She said that race would be a protective characteristic, and derogatory comments or jokes would be a violation of the code of ethics. She said she believed that the use of a racial epithet like calling an African American a negro would be a derogatory comment based on somebody's race. She stated further that based on her understanding of the code of ethics, that making a generalization about an entire race labeling that race as a victim or dramatic would be a derogatory comment.

Ms. Rutherford submitted into evidence the Frontier Communications electronic communication policy, and she indicated the grievant signed his name as receiving the policy. She noted that the policy says that Frontier will not tolerate or condone any type of discriminatory harassment. She contended the policy is a "zero tolerance" policy. Ms. Rutherford provided further explanation of the policy, including some examples of conduct that would be violative of the policy. She stated that she got notice of the text that was sent by the grievant to Ms. Hunter. She said Ms. Hunter was extremely upset, and she told her to take a break and calm down. She testified the grievant approached her

2

and said he did something in the office that he was really upset about and that he regretted, that being he sent a text by mistake to Jennifer Hunter, and he said he wanted to apologize. She related she eventually did receive a copy of the text message from Jennifer Hunter. She stated that after she received the text, she called her Director, Sherry Crutchfield, and discussed the matter with her. She testified that the Company conducted an investigation into what occurred, and she shared the results of the investigation. As part of the investigation, Ms. Rutherford said Ms. Hunter used inappropriate language, saying the word "bitch". She contended that during the investigation, no evidence was developed that any of the profanity used by Ms. Hunter was related to an individual's protected characteristic, for example, race or age or gender. She said the investigation revealed that the conduct engaged in by Ms. Hunter was different than the conduct of the grievant. Specifically, with the grievant, it was discriminative, and stereotyping, but with Ms. Hunter, it was bad language.

During cross examination, Ms. Rutherford testified that the Company did not conduct a separate investigation as to whether Jennifer Hunter violated the non-harassment policy. She indicated Ms. Hunter used the word "fuck". She noted that it was not acceptable for Ms. Hunter to use bad language in the workplace. She stated she is aware that the grievant is a homosexual. She said the Agreement prohibits discrimination on the basis of sexual orientation. She stated that it could be discrimination to call a co-worker a bitch because of their sexual orientation.

The grievant testified he was hired on November 17, 2014 as an operator, and he has been working for Operator Services. He said he received a performance evaluation for 2016, and such document was submitted into evidence. He stated that on the day of the

3

incident there were seven employees, but there was no supervisor. He said this was on December 21, 2018. He indicated since he has worked in his location there was a television set, and it was a general understanding with the people in the room, if we wanted to change a channel, or wanted to watch a certain program, it was just kind of an understanding. He stated further the volume would be monitored so if it was an issue with anybody, there was never an issue of not, somebody refusing to turn the volume down or monitor the volume. He stated that he and all of his co-workers got along.

Regarding the incident on question, he testified that Jennifer went to lunch. He said he proceeded to get up and get the remote that was sitting on the partition of the cube. He recalled it being changed to a weather channel, then he sat and continued his work as usual. He stated the other workers in the room had no issue with him changing the channel. He testified when Ms. Hunter returned, it appeared she was agitated and upset. He said she slammed her desk and said "fuck it", got up from her desk, walked around the cubicle, came back to his desk, reached in behind him, and grabbed the remote off his desk, turned the volume completely down on the television, and then tossed the remote back on his desk and told him that if he wanted to change it that I could have just asked her for it and then went back to her desk. He indicated she said the words that she had been suspended over one bitch, that she was afraid to do it again. He testified he felt violated and intimidated by her, and he was offended and upset, because his is a homosexual. He said Ms. Hunter and everyone in the office knew he was a homosexual. He related he told Ms. Hunter it didn't have to be that way, that she could have asked for the remote back, and he would have handed it to her. He said it was his lunchtime and he left the room. The grievant said he felt like he needed to report the matter to a supervisor

4

so he went to look for one. He contended he was very shaken, so he sat on the end of a truck and just kind of processed through things. He stated he was upset, and that is when he sent the text message that he regretfully sent to Jennifer. He said he intended to send the text message to a friend, who he does not work with. He stated he decided to call his supervisor, Pam Rutherford, and tell her about the situation which was going on. He pointed out Ms. Rutherford told him to keep her updated as to what was going on. He stated he told Ms. Rutherford he wanted to apologize to Jennifer.

During cross examination, the grievant said he is familiar with the code of business conduct, and he understands that the Company prohibits harassment and discrimination of any kind. The grievant testified that his text message was inappropriate. He stated that when Jennifer referred to a "bitch" she was referring to him. He said when the incident occurred, he was a victim as well, but he wanted to resolve the whole situation and apologize to her and remedy the situation and move on from it.

Lexie Aman, operator in Operator Services, said she was working on December 21st. She described the events as to what occurred. She said when Jennifer came back from her break she was upset and she heard Jennifer say "I don't know why people think I am nice. They put me on meds for this, and I don't know why people try to push my buttons". She contended Jennifer stood up and said "fuck it", then walked around form her position over to Dustin's, grabbed the remote, muted the volume on the TV, and then said ---. She threw the remote back down and said, "If you wanted the remote, all you had to do was ask".

5

### III.  COMPANY POSITION

The Company believes the sole issue to be whether the discharge of the grievant was for just cause, and if not, what shall be the remedy. At the heart of this matter, is the determination as to whether or not the Company has just cause to terminate grievant from his employment. While the Agreement is silent on the exact definition of just cause, there are a litany of prior arbitration decisions the find, at its core, that just cause includes notions of reasonableness and fairness.

The Company asserts the undisputed evidence demonstrates that grievant violated the Company's code of business conduct and ethics, and its non-harassment policy, by committing acts of racial harassment and discrimination. There is no dispute that grievant was bound by both the Company's code of business conduct and ethics and its non-harassment policy. The Company argues the non-harassment policy is crystal clear that engaging in race related harassment will subject an employee to discipline, including discharge from employment.

The Company argues that in this case the grievant has admitted that he committed two separate acts of racial discrimination/harassment, each of which supports termination standing alone. First, it is entirely undisputed that grievant utilized a racial slur when he referred to his African-American co-worker as a "negro". Likewise, it is undisputed that grievant engaged in negative stereotyping of when he wrote to his co-worker that because she was African-American, she must be "dramatic" and "always a victim". These two separate violations of the code of conduct and non-harassment policy should result in the

6

discharge of the grievant. Ultimately, the Company made the only disciplinary decision which was appropriate, discharge for just cause.

It is the position of the Company that the Union's post-hoc argument of disparate treatment is without any merit, and is directly contradicted by grievant's own testimony. The only argument advanced by the Union at arbitration was a disingenuous claim that the grievant should be reinstated because there was a disparity in discipline between himself and Ms. Hunter. This argument is premised upon a misguided and factually inaccurate allegation that Ms. Hunter made a derogatory statement about grievant's sexuality (grievant is a gay) when she said "she was suspended over one bitch and she's not afraid to do it again". It is argued by the Company that neither the Union nor the grievant ever raised this allegation prior to grievant's discharge, nor did either party ever file a grievance over the issue. It is the position of the Company that the conduct of the grievant and Ms. Hunter were different, and the conduct of Ms. Hunter did not constitute the same type of harassing discriminatory conduct as grievant's racist comments. Consequently, there was no disparity in discipline, because there was no evidence that Ms. Hunter engaged in similar conduct which would have required similar discipline.

The Company contends that the arbitrator should reject the Union's disparate treatment argument, and because there are no mitigating factors for grievant's intolerable, racist conduct, the grievance should be denied.

7

## IV. UNION POSITION

The Union believes the issue to be whether or not the Company terminated the grievant for just cause, and if not, what shall be the remedy. It is the position of the Union that the Company failed to show that the grievant's termination was supported by just cause. It is necessary for the employer to prove both that misconduct occurred and that the penalty imposed was just to a reasonable and fair minded person. It is necessary, according to the Union, that the employer's investigation be conducted fairly and objectively, that the Company applied its rules evenhandedly, and the degree of discipline was reasonably related to the employee's proven offense and his record of service with the Company. In this case, the Company's investigation was not conducted fairly and objectively. The Company was aware that Ms. Hunter used inappropriate language toward the grievant, but declined to investigate whether discipline against Ms. Hunter was appropriate. The Company failed to investigate whether Ms. Hunter's use of the word "bitch" was related to the grievant's sexual orientation, even though his homosexuality was well known in the office. It is contended by the Union that the Company essentially treated two employees differently for alleged violation of the same policy. While the Company began an investigation, and ultimately issued a termination of the grievant, during such investigation it determined information about Ms. Hunter using profanities, including the use of the word "bitch" to a homosexual employee, but did not conclude such investigation fairly. Because the Company did not apply its rules evenhandedly, it cannot show that grievant's termination was supported by just cause.

It is the position of the Company that it failed to follow progressive discipline in this instance. The contention of the Company that its "zero tolerance" policy requires it to

8

terminate the grievant cannot be squared with the just cause provision of the Agreement, and does not override such just cause provision. As zero tolerance policies fly in the face of just cause, arbitrators will not hesitate to apply progressive discipline principles when employees are accused of using racial slurs. Furthermore, in this case the grievant recognized the wrongfulness of his actions and immediately wanted to apologize.

For all of the reasons mentioned, the grievance should be sustained, the grievant should be reinstated and be made whole for all loses he sustained.

## V. RELEVANT CONTRACTUAL AND POLICY LANGUAGE

### A. RELEVANT CONTRACTUAL LANGUAGE

*Article II – Non-Discrimination*

**SECTION 1.** In a desire to restate their respective policies, neither the Company not the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, sexual orientation, age, disability, or national origin; or because of his activities in behalf of the Union; or because he is a disabled veteran or a veteran of the Vietnam era; Provided, however, that nothing in this provision shall be construed to create rights under any provision of the Company's pension or welfare benefits plans or to modify or affect those plans in any way.

**SECTION 2.** The use of the masculine or feminine gender in this General Agreement shall be construed as including both genders and not as a sex limitation. (Jt. Ex. 1, pp. 21-22).

## B. RELEVANT POLICY LANGUAGE

## FRONTIER COMMUNICATIONS CODE OF BUSINESS CONDUCT AND ETHICS

1. *Who Must Follow Our Code*

All Frontier employees are expected to uphold the highest standards of business ethics and to know and follow applicable policies, laws and regulations…(Company Ex. 1, p. 1).

2. *Treating One Another with Respect*

Further, Frontier does not tolerate illegal discrimination, harassment, or threats of any kind. Comments or conduct relating to a person's race, color, religion, national origin, ancestry, sexual orientation, gender, marital status, age, physical or mental disability, or veteran status that fail to respect the dignity of the individual are unacceptable. Such unacceptable behavior can be either sexual or non-sexual in nature and can include, among other things, the following:

* Derogatory comments or jokes

* Visual displays, such as offensive photographs, videos and drawings

* Unwelcome conduct, including physical contact, such as touching, hugging, and massaging

* Assault, bullying, or intimidation

Frontier does not tolerate harassment or discrimination (whether committed by a coworker, a supervisor, or even a non-employee) and does not tolerate retaliation against anyone for a good faith report of discrimination or harassment. (Company Ex. 1, p. 7).

### NON-HARASSMENT POLICY

Frontier will not tolerate, condone or allow any discriminatory harassment, including sexual, of any of its employees by a manager or supervisor, co-workers, customers, vendors or others with whom the Company does business. The Company has no tolerance for such harassment.

Frontier will not tolerate verbal, written, or physical conduct the harasses, disrupts or interferes with another's work performance or which creates an intimidating, offensive or hostile environment.

The conduct includes, but is not limited to:

1. Epithets, slurs, negative stereotyping, threatening, intimidating or hostile acts, that relate to race, color, religion, national origin, sexual orientation, age or disability.

2. Written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, gender, national origin, sexual orientation, age, or disability and that is placed on walls, bulletin boards, e-mail, downloaded and displayed from the Internet, or elsewhere circulated in the workplace.

Supervisors or employees who engage in any of the above conduct will be subject to disciplinary action, up to and including discharge…(Company Ex. 2, p. 3).

### VI.   OPINION

The issue to be determined is whether or not the Company had just cause to terminate the employment of the grievant. A review of the relevant record has established

11

the following material facts. The grievant was hired by the Company as an operator in Bridgeport Operator Services on November 17, 2014. On his most recent performance report, he was ranked as a proficient operator. During December 2018, there were twelve operators working in Operator Services in Bridgeport. The operators worked in close proximity to one another, and the Company did not have a policy against having a television in the operator's office. The employees, would determine among themselves, who would change the channel or adjust the volume. On December 21, 2018, the grievant was working the 10:30 AM to 7:00 PM shift. Also working was operators Jennifer Hunter, Lexi Aman, Sandy Abbott, Lori Metz, Dustin White and Michelle Shadrick. On the morning of December 21, Jennifer Hunter was watching the television. When Ms. Hunter left the room for her lunch break, the grievant changed the channel. When Ms. Hunter returned from her lunch break according to the evidence established in the record, Ms. Hunter was agitated. According to information developed during the investigation, Ms. Hunter made a number of comments such as "I don't know why people push my buttons". At one point Ms. Hunter slammed the desk saying "fuck it", grabbed the remote, walked behind the grievant, muted the television, and threw the remote back down on his desk. She stated if Dustin wanted to change the television, all he had to do was ask. Ms. Hunter also stated she had been suspended over one bitch and was not afraid to do it again. The grievant contended he felt violated and intimidated and he left the room for his lunch break. According to Sandy Abbott, who was interviewed by the Company in this matter, Ms. Hunter stated "where did the bitch go" and pointed toward the grievant's position, stating "now that's a bitch". The grievant then prepared a text which stated "so this just happened. So Jenny had the TV remote when we got here

12

watching Judge shows (crap) but she's negro so she's dramatic and always the victim". He sent the text message to Ms. Hunter, claiming that he did not intend to send the message to Ms. Hunter. After the Company's investigation was completed, a decision was made to terminate the grievant.

I have carefully reviewed the evidence, the Agreement and the arguments and citations of the parties. Upon completing such review, in light of the Company's established policies, it is evident that the grievant's text was improper, was wrong, and was in violation of the Company's rules and regulations. There are no arguments that could be put forth which could justify the text in any manner whatsoever. From a "just cause" standpoint, the grievant's behavior was flat out "wrong" and unjustified. This being the case, it is understandable that the Company has determined that the grievant needed to be disciplined. After carefully reviewing the grievant's behavior, I am in agreement with the Company that the grievant needed to be disciplined for his behavior.

The question arises as to whether or not the grievant's termination was justified. When making a just cause review one element is for the employer to conduct a full and fair investigation to determine what actually occurred, for the purpose of determining if the discipline issued was fairly administered under the specific circumstances. What occurred in this situation was an incident that took place, initiated by Ms. Hunter, which ultimately resulted in the grievant sending an inappropriate text to Ms. Hunter. It is clear that Article 11. Section 1 of the Agreement provides that it shall be unlawful to have discrimination against any employee because of an employee's race or color, but such section also prohibits discrimination against any employee because of such employee's sexual orientation. In this case, the evidence clearly shows that Ms. Hunter was affected

13

because of her race or color, but as the unrefuted evidence has shown, the grievant, being known to his co-workers as being gay, may have been affected as was Ms. Hunter, but under the language involving sexual orientation. I am not saying that the grievant was justified in sending the text in question to Ms. Hunter because as I indicated, he was not justified in sending such text, and he needed to be disciplined for such text. The problem with the Company's investigation of the incident was that it did not consider whether or not the grievant's rights were also violated under the Agreement and the applicable Company policies and provisions. I am not saying that Ms. Hunter's comments were inappropriate or that she needed to be disciplined. What I am saying is that Ms. Hunter's comments should have at least been investigated as part of the incident which occurred. The evidence shows there was no such investigation to determine if the grievant's rights were also violated, or if there was such an investigation, the Company decided there was no problem with Ms. Hunter's words or actions on the day in question. In my considered opinion, the investigation that occurred in this instance was not complete. Because the applicable Agreement provision and policies refer to unlawful or illegal discrimination against any employee because of such employee's race, color, religion, sex, sexual orientation, age, disability or national origin; or because of his activities in behalf of the Union; or because he is a disabled veteran of the Vietnam era. It is reasonable to conduct that Ms. Hunter's comments during the incident may have had an inappropriate effect on the grievant, who is known to be gay. Because the Company did not have a complete investigation of the incident in question, it is my determination that there needs to be a reduction in the disciplinary penalty given to the grievant. While I am not saying that Ms. Hunter needed to be disciplined, it is my opinion that the applicable Agreement provision

and policies were applicable to both Ms. Hunter and the grievant, and based upon the evidence provided, the Company gave Ms. Hunter a pass without a complete investigation, while the grievant was terminated. This scenario, in my opinion, has created a disparate situation, justifying a reduction in the disciplinary penalty given the grievant.

## AWARD

The Company was justified in issuing discipline to the grievant for the text he sent to Ms. Hunter. For the reasons mentioned above, his termination is reduced to a six month suspension. He is to be returned to work and be made whole for all loses he incurred following the six month suspension.

William J. Miller, Jr.
Arbitrator
December 1, 2019

15